**M.M.UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

M.M., an individual;

                Plaintiff

      -against-

WYNDHAM HOTELS & RESORTS, INC. AND
DAYS INNS WORLDWIDE, INC.;

             Defendant.

CIVIL ACTION NO :

**COMPLAINT**
**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW the Plaintiff M.M., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. Wyndham Hotel & Resorts, Inc. through its wholly owned subsidiary, Days Inns Worldwide Inc., (hereinafter collectively referred to as "Wyndham") know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Wyndham has instead chosen to ignore the open and obvious presence of sex trafficking at their hotels; enjoying the profit from rooms rented for this explicit and apparent purpose.

3. This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials M.M., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

1

4. M.M. was first trafficked for commercial sex at the age of nineteen (19) years old throughout the State of Minnesota. Young and naïve, M.M. was introduced by her friends to a man who associated with a criminal element and she quickly became a target. M.M.'s trafficker would set up appointments for her to sexually service buyers, and would keep her heavily drugged.

5. The Plaintiff now brings this action for damages against the Defendant listed herein. Each of the Defendant, in violation of 18 U.S.C. § 1595, knowingly benefited from a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6. M.M. was advertised online against her will, physically tortured, and then sexually exploited under such duress at hotels throughout the St. Paul area, including the Days Inn® by Wyndham St. Paul – Minneapolis-Midway at 1964 University Avenue in St. Paul, Minnesota.

7. As a direct and proximate result of the Defendant's consistent refusals to prevent human trafficking at their hotels, M.M. was sexually exploited and repeatedly victimized at hotels under the Defendant's flag.

**PARTIES**

8. Plaintiff M.M. is a natural person who resides in St. Paul, Minnesota.

    a. Plaintiff M.M. was only nineteen (19) years old when she was sold for sex and trafficked throughout the St. Paul area. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).

    b. Due to the sensitive nature of the issues, Plaintiff M.M. requests this Court to grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter. [1]

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214

c.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

d.  Here, pseudonym status and to proceed under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]

f.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personally identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identities in a manner that will compromise her personal life or future employment prospects.

9.  Defendant Wyndham Hotel & Resorts, Inc. is one of the world's largest hotel companies and

---

F.3d 1058, 1069 (9th Cir. 2000).

[2]  Fed. R. Civ. P. 10(a).

[3]  A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir.); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity); *see also Doe v. N. Homes, Inc.*, 18-CV-3419 (WMW/LIB), 2019 WL 3766380, at *5 (D. Minn. Aug. 9, 2019) (holding that the case involving the sexual abuse of a vulnerable child was an issue of the utmost sensitivity, warranting plaintiff's motion to proceed under pseudonym).

[4]  Fed. R. Civ. P. 26(c).

[5]  *See supra* note 3.

offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Parsippany, New Jersey.

10.    Defendant Days Inns Worldwide, Inc. is a wholly owned subsidiary of Defendant Wyndham Hotel & Resorts, Inc. It is a Delaware Corporation with its headquarters in Parsippany, New Jersey.

    a.    Defendant Wyndham Hotel & Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of the predecessor.

    b.    Days Inns® brand hotels are Wyndham hotels.

    c.    As a hotel operator, Defendant Wyndham controls the training and policies for its hotels including the Days Inns® hotel where M.M. was trafficked.

    d.    Defendant Wyndham maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.[6]

    e.    By and through its relationship with the staff at the Days Inns® hotel where M.M. was trafficked and the hotel guest perpetrator who trafficked her at a Days Inns® hotel, Defendant Wyndham knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

    f.    Wyndham receives a percentage of the gross room revenue from the money generated by the operations of all Days Inns® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

    g.    At all relevant times, Wyndham owned, supervised, and/or operated the Days Inn® by Wyndham St. Paul – Minneapolis-Midway at 1964 University Avenue in St. Paul, Minnesota.

---

[6]    Wyndham Hotel & Resorts, 2019 Social Responsibility Report: Protecting Our Human Rights (p.30) available at https://corporate.wyndhamhotels.com/wp-content/uploads/2019/07/Wyndham-GRI-2019-Final_web.pdf (last visited Nov. 20, 2019).

h.   Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Minnesota, operates dozens of hotels in Minnesota, contracts to supply services in Minnesota, and caused indivisible injuries to a vulnerable Plaintiff by participating in a sex trafficking venture that arose out of a common course of conduct occurring in the state of Minnesota.

11.   Whenever reference is made in this Complaint to any act, deed or conduct of the Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

## JURISDICTION AND VENUE

12.   This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

13.   Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendant's misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

14.   Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

15.   To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and

§1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

16. Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

17. Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion – or performed by a minor under the age of 18 – are guilty of sex trafficking. This includes, at a minimum, **_both_** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work **_and_** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[7]

### FACTUAL ALLEGATIONS

### A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project* [8]

18. Human trafficking is the world's fastest growing crime.[9] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year

---

[7] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law **_both_** categories are 'traffickers'.

[8] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[9] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

making it the second largest illicit crime industry behind only the sale of *all* illegal drugs.[10]

19.    Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

20.    The hospitality industry plays a crucial role in the sex trade.[11]   The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

21.    According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[12]   Traffickers and buyers alike frequently use hotel rooms to exploit victims.

22.    Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an 'in call'.

23.    Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[13]

24.    The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents

---

[10] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[12] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[13] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

happen in hotels ranging from luxury to economy.[14]  Even estimates by attorneys *for* the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[15]

25.    Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[16]  Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

26.    Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

27.    But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[17]

28.    Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel

---

[14] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[15] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[16] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).
[17] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

industry over the last decade to help hotel staff in every position to identify the signs.[18]

29.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

30.     Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[19]

31.      Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[20] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

32.     Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[21]

33.     In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

34.     The hospitality industry has been cognizant of their role and responsibilities in the sex

---

[18] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[19] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[20] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[21] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

trafficking industry for years.

35.    In 2011, Wyndham trained only some of its employees to look for signs of trafficking.[22]

36.    In 2012, an anti-trafficking coalition alerted Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[23]

37.    Marriott International claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [24]

38.    Choice Hotels has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[25]

39.    A number of nationwide campaigns recognized the acute issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign, and then domestically in 2010 with the Department of Homeland Security's Blue Campaign.[26]   These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human

---

[22] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[23] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).
[24] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).
[25] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).
[26] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

trafficking.[27]

40.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B.     THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

41.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

42.     The average consumer does not see this relationship.  The parent brand gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

43.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent brand.[28]

44.     The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

---

[27] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[28] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

45.     Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

46.     At the time of the incidents alleged herein:

    a.   Defendant Wyndham owned and controlled the Days Inns® brand.

47.     Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments so it is seldom done.

## C.  THE DEFENDANTS WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR BRANDED HOTELS

48.  Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring across their Days Inn® by Wyndham hotels yet these brand managers failed to take the necessary action to prevent sex trafficking within their brand and continue to fail.

49.  Defendant Wyndham owns, supervises, or operates the Days Inn® by Wyndham St. Paul – Minneapolis-Midway at 1964 University Avenue in St. Paul, Minnesota.

50.  Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff M.M. from being sex trafficked.

51.  Wyndham knew or should have known that the Days Inn® hotel where Plaintiff M.M. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff H.M. was trafficked.

52.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

53.     Defendant Wyndham could have exercised control over Days Inn® hotels by:

    a.   distributing information to assist employees in identifying human trafficking;

    b.   providing a process for escalating human trafficking concerns within the organization;

    c.   requiring employees to attend training related to human trafficking;

    d.   providing new hire orientation on human rights and corporate responsibility;

    e.   providing training and education to Days Inn® branded hotels through webinars, seminars, conferences, and online portals;

    f.   developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

54.    Wyndham was in an actual and/or apparent agency relationship with Days Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Days Inn® hotels by Defendant Wyndham's operations, including the means and methods of how Days Inn® branded hotels conducted daily business through one or more of the following actions:

    a.   hosting online bookings on Defendant Wyndham's domain;

    b.   requiring Days Inn® branded hotels to use Defendant Wyndham's customer rewards program;

    c.   setting employee wages;

    d.   making employment decisions;

    e.   advertising for employment;

    f.   sharing profits;

    g.   standardized training methods for employees;

    h.   building and maintaining the facility in a manner specified by the owner;

    i.   standardized or strict rules of operation;

    j.   regular inspection of the facility and operation by owner;

    k.   fixing prices; or

    l.   other actions that deprive Days Inn® branded hotels of independence in business operations.

13

55.    An apparent agency also exists between Defendant Wyndham and Days Inn® hotels. Defendant Wyndham held out Days Inn® branded hotels to the public as possessing authority to act on its behalf.

56.    Given Defendant Wyndham's public statements on behalf of its hotel brands[29] and the control it assumed in educating, implementing, and directing its branded hotels, including Days Inn® branded hotels, Defendant Wyndham breached its duties in the following ways:

i.    Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

ii.    Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

iii.    Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

iv.    Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

v.    Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.    Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

vii.    Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators

---

[29] *See* MODERN SLAVERY STATEMENT, Wyndham Hotels and Resorts INC. at https://corporate.wyndhamhotels.com/modern-slavery-statement/ ("Ranked among the World's Most Ethical Companies, our predecessor's parent company, Wyndham Worldwide Corporation, publicly acknowledged its commitment to operate its business in a manner consistent with the United Nations Universal Declaration of Human Rights and Global Compact since 2007 when it first published its Human Rights Policy Statement, a commitment which we continue.") *See also* Wyndham Hotels and Resorts INC., Our Brands – Days Inn by Wyndham at https://corporate.wyndhamhotels.com/our-brands/days-inn/ ("With over 1,800 properties worldwide, Days Inn helps guests make time with family and friends brighter. Nothing brings us closer like the experience of getting away and creating moments. It's time we all seize the days!") *See also* Wyndham Hotels and Resorts INC., Our Mission https://corporate.wyndhamhotels.com/about-us/mission-vision-values/ ("Our Core Values – Integrity: We hold ourselves to the highest standards. We're responsible, truthful and transparent. We do the right thing. Accountability: We honor our commitments and deliver results. Under any circumstance, we stand up and say: "Count on Me."")

and key metrics on human trafficking prevention.

b. For years, Defendant Wyndham has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Days Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Days Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff M.M. at Days Inn® hotels that forms the basis of this complaint.

    i. In February 2019, a man ran a human trafficking operation out of a Days Inn® in Madison Heights, Michigan.[30]

    ii. In August 2018, four people were arrested for trafficking a 15-year old girl out of a Days Inn® in Marietta, Georgia. They kept the young girl in captivity by threatening to kill her if she tried to escape.[31]

    iii. In October 2015, a man prostituted women out of a Days Inn® in Reading, Pennsylvania. He controlled the women with drugs and set up sexual encounters.[32]

    iv. In September 2018, a woman was caught sex trafficking two 17-year old girls at a Days Inn® in Fayetteville, North Carolina.[33]

    v. In July 2018, a man used social media websites to coerce a young girl to come to a Days Inn® Gulfport, Mississippi. When she arrived, the man forced her into sexual servitude.[34]

    vi. In December 2018, a couple coerced females from China to move to Maine by

---

[30] *Man Charged for Sex Trafficking Out of Madison Heights Days Inn*, FOX 2 DETROIT, (Feb. 15, 2019) http://www.fox2detroit.com/news/local-news/man-arrested-for-sex-trafficking-out-of-madison-heights-days-inn
[31] Shaddi Abusaid, *Marietta Sex Trafficking Ring Thwarted, Police Say*, MARIETTA DAILY JOURNAL, (Aug. 21, 2018) https://www.mdjonline.com/news/marietta-sex-trafficking-ring-thwarted-police-say/article_997739c0-a55b-11e8-9647-338800611347.html
[32] Joseph Kohut, *Scranton Sex Trafficking Cases Move Forward*, TIMES TRIBUNE, (Dec. 4, 2016) https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward
[33] Nancy McCleary, *Fayetteville Woman Charged in Human Trafficking Operation*, FAYETTEVILLE OBSERVER, (Sept. 21, 2018), https://www.fayobserver.com/news/20180921/fayetteville-woman-charged-in-human-trafficking-operation.
[34] Robin Fitzgerald, *Girl Found At a Gulfport Hotel. A Man With Her Is Accused Of Human Trafficking, Sheriff Says*, SUN HERALD, (July 19, 2018) https://www.sunherald.com/news/local/crime/article215055145.html

offering tourist visas. Upon arrival, the couple stripped the women and girls of their identification, advertised them as prostitutes on Craigslist, and forced them to sexually service men at two Days Inn® locations, one in Kittery and the other in Dover, New Hampshire.[35]

vii. In June 2018, three individuals were arrested in a human trafficking scheme at a Days Inn® in Virginia Beach, Virginia.[36]

### D.   THE SEX TRAFFICKING OF M.M.

57.    The facts alleged herein stem from a sex trafficking ring operating near St. Paul, Minnesota. While victimized by her traffickers, M.M. was subject to rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendant's hotels.

58.    In 2010, at 19 years old, M.M. was out with friends when she was introduced to a group of men who worked for her would be trafficker. The group engaged M.M. in a scheme of intimidation that included repeatedly breaking into M.M.'s apartment. Once inside M.M.'s apartment, the group would advertise her online and force her to sexually service buyers. The break-ins then became a warning to M.M. from her traffickers to service more clients or face the violent consequences.

59.  Between the years of 2010 and 2018, M.M. was trafficked and falsely imprisoned at numerous hotels in the St. Paul area including the Days Inn® by Wyndham St. Paul – Minneapolis-Midway at 1964 University Avenue in St. Paul, Minnesota.

60.  While at the Days Inn® by Wyndham St. Paul – Minneapolis-Midway at 1964 University Avenue in St. Paul, Minnesota, M.M. was often subjected to brutal physical beatings at the hands of her traffickers if she did not comply with their rules.

61.  Throughout the time that M.M. was being trafficked, she would often be violently sexually

---

[35]Elizabeth Dinan, *Husband, Wife Charged In Sex Trafficking, Prostitution 'Scheme'*, SEACOAST ONLINE, (Dec. 14, 2018) https://www.seacoastonline.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme

[36] Jason Marks, *Three Sex Trafficking Suspects Arrested By Virginia Beach Police*, 10 WAVY, (June 1, 2018) https://www.wavy.com/news/local-news/virginia-beach/three-sex-trafficking-suspects-arrested-by-virginia-beach-police/1213339402

assaulted by buyers. On multiple occasions while being trafficked M.M. could be heard screaming and calling out for help in distress by the patrons and staff of the Days Inn® by Wyndham St. Paul – Minneapolis-Midway.

62. In addition to punishing her with physical violence every time she did not conform to their rules, M.M.'s traffickers controlled her by keeping her intoxicated on narcotics.

63. One of M.M.'s traffickers would rent a room for M.M. to live in and service the clients they arranged for her.  M.M's trafficker frequently paid for the room one night at a time and in cash.

64. M.M. was forced to perform commercial sex acts on as many buyers in an evening as she physically could. Each buyer entering and exiting the room at the Days Inn® as an unannounced guest.

65. The room was frequently left with numerous used condoms scattered across various surfaces at the end of the evening, as well as an abundance of trash that indicated the visitor traffic through the room.

66. On several occasions, M.M.'s traffickers injured her so badly that she knew it was noticeable to the public. M.M. was also visibly intoxicated and/ or sedated upon exiting and entering the Days Inn®.

67. M.M. also presented to the Days Inn® without any personal belongings, exhibiting poor hygiene to the extent that her hair was matted to her head, a clearly sedated affect, and signs of physical injury.

68. Other signs that should have alerted hotel staff to M.M. being trafficked for commercial sex at the Days Inn® included, the do not disturb sign staying on the door for days, declining any cleaning services over the time she was there.

69. M.M. finally escaped from her traffickers when she was 27 years old.

70. Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at its hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding suspicious activity. The Defendant failed to take any actions to curtail these activities.

71. Had the Defendant been paying attention to the activities being conducted at its hotels, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of M.M.

## E.  THE DEFENDANT FACILITATED THE TRAFFICKING OF M.M.

72.    Wyndham profited from the sex trafficking of M.M. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendant leased rooms to M.M.'s traffickers, when they knew, or should have known, that he was using their room to imprison M.M., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

73.    Wyndham knew, or should have known, that M.M. was being trafficked and knew they were benefiting financially from said exploitation.

74.    Wyndham knew, or should have known, that M.M. was being trafficked because M.M. was arrested on property grounds, constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using the Defendant's hotels for his illegal sex trafficking venture.

75.    Wyndham actively participated in this illegal endeavor by knowingly or negligently providing lodging to M.M.'s trafficker in which to harbor M.M. while he was trafficking her.

76.    Wyndham profited from the sex trafficking of M.M. and knowingly or negligently aided and participated with M.M.'s trafficker in his criminal venture. The Defendant took no action as M.M. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent injuries all over her person.

77.    Wyndham actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from M.M. in which to harbor M.M. while she was being trafficked.

78.    Wyndham had the opportunity to stop M.M.'s trafficker and offenders like him from victimizing M.M. and others like her.  Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

79.    Wyndham financially benefited from the sex trafficking of M.M., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

80.    Wyndham enjoys the steady stream of income that sex traffickers bring to their hotels.

81.     Wyndham financially benefits from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

82.     Wyndham failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

83.     Wyndham maintained their deficiencies to maximize profits by:

   a.   Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

   b.   Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

   c.   Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

84.     As a direct and proximate result of these egregious practices on the part of the Defendant, M.M. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.   COUNT ONE – 18 U.S.C §1595 ("TVPRA")

85.     The Plaintiff M.M. incorporates each foregoing allegation.

86.     M.M. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

87.     The Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendant had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, the Defendant breached this duty by participating in, and

19

facilitating, the harboring and providing of M.M. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

88.     The Defendant has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendant directly benefitted from the trafficking of M.M. on each occasion they received payment for rooms that she was being kept in at the Defendant's hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of M.M.'s injuries and damages.

89.   M.M. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendant's hotels and properties in violation of 18 U.S.C. §1591 (a).

### B.  COUNT TWO – NEGLIGENCE

90.  The Plaintiff M.M. incorporates each foregoing allegation.

91.     The Defendant, and their actual and/or apparent agents, servants and/or employees, owed to M.M. a duty to use reasonable and ordinary care to provide for safety in light of the peculiar risk of sex trafficking at hotels, and to protect M.M. from injury caused by an unreasonable risk of danger in their hotel and/or on their property.

92.     Upon information and belief, prior to and during the incidents alleged herein, as outlined above, the Defendant had actual and/or constructive notice of a dangerous condition in their hotels and on their properties, including but not limited to human trafficking.

93.     In addition to the Defendant's actual and /or constructive notice, the Defendant's negligent acts, omissions, and/or commissions created a dangerous condition at their hotel and on their property, to wit, a hotel and property with inadequate security that fostered an environment which encouraged human trafficking and sexual exploitation.

94.  In addition to the Defendant's actual and /or constructive notice, the Defendant's negligent acts, omissions, and/or commissions failed to address the peculiar risk of sex trafficking in hotels, to wit, a

hotel environment which encouraged human trafficking and sexual exploitation.

95.     The Defendant breached this duty of care by acts, omissions, and commissions including, but not limited to:

a. Failure to properly monitor surveillance cameras in the hotel and/or on the property for criminal activity and/or signs of human trafficking and/or sexual exploitation in the hotel and/or on the property;

b. Failure to properly monitor the number of guests in the rooms of the hotel and/or on the property;

c. Failure to provide adequate security in the hotel and/or on the property with the knowledge that said premises had a history of criminal activity;

d. Failure to properly monitor the hotel and/or property for signs of dangerous conditions, including, but not limited to, human trafficking, false imprisonment, rape, kidnapping, and sexual exploitation, by ignoring the following conditions:

   i. The repeated refusal of maid service;

   ii. The repeated, almost exclusive, use of side or rear exits for ingress and egress.

   iii. The number and frequency of visitors entering and exiting the Hotel and/or property;

   iv. The number of guests present in any particular room as compared to the rooms capacity;

   v. Signs of the repeated verbal abuse, physical abuse, restraint and/or confinement of an individual by another;

   vi. Signs of control over an individual and/or an individual's personal property by another, including, but not limited to, identification documents;

   vii. Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire;

    viii.  The repeated renting of specific rooms in their hotels.

e.  Failure to properly monitor and investigate the hotel and property for signs of suspicious behavior on the premises. Behavior, which would have alerted the Defendant to the sex trafficking of M.M. or at least other criminal activity to which the Plaintiff was a victim. Behavior including, but not limited to, sounds of distress coming from rooms and areas in the hotel, non-guests entering and exiting rooms in the hotel, the repeated renting of specific rooms in the hotel, and the apparent purchasing of sex acts in the hotel.

f.  Failure to properly advise law enforcement of suspicious behavior on the premises which would have alerted the Defendant to the sex trafficking of M.M. or the other criminal activity to which she was a victim. Behavior, including, but not limited to sounds of distress coming from rooms and areas in the hotel, non-guests entering and exiting rooms in the hotel and/or property, the repeated renting of specific rooms in the hotel, and the apparent purchasing of sex acts in the hotel.

g.  Failure to adequately respond to, and investigate, guest complaints regarding suspicious behavior at the hotel and/or on the property, which would have resulted in the discovery of the sex trafficking of M.M. or the other criminal activity to which she was a victim;

h.  Failure to adequately respond to and investigate each of the above articulated issues, which would have stopped the ongoing victimization M.M.; and

i.  Being otherwise careless and negligent.

96.  As a direct and proximate result of the aforementioned negligent acts, omissions, and/or commissions by the Defendant, M.M. was kidnapped, repeatedly and consistently assaulted both physically and sexually, verbally abused, held against her will, regularly exploited, and was otherwise irreparably injured, both physically and psychologically. Said acts were repeatedly perpetrated at the Defendant's hotels and the Defendant had actual or constructive knowledge that these acts, as well as other similar criminal acts, were taking place, and that a peculiar risk resided in their enterprise, and the

Defendant had sufficient time to address it and were in the best position to do so. The imminent harm described above, as well as M.M.'s injuries, were a foreseeable and preventable result of the Defendant's negligence.

97.     M.M. has suffered, and/or will continue to suffer, from injuries, including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss, past, present and future, as a direct and proximate result of the Defendant's, and/or their actual and/or apparent agents, servants, and/or employees', negligent acts, omissions, and/or commissions. By ignoring indicia of criminal activity, the Defendant facilitated such an environment of disorder and violence that the injuries sustained by M.M. were both foreseeable and imminent.

98.     Additionally, M.M. has suffered, and continues to suffer, from damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and/or medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendant's, and/or their actual and/or apparent agents, servants, and/or employees', negligent acts, omissions, and/or commissions.

99.     Furthermore, M.M. has suffered, and continues to suffer, from injuries, including, but not limited to multiple abortions, a fractured rib, , a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life expectations and mental health diagnoses.

100.     The Plaintiff avers that all damages, past, present, and future, were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendant and/or their actual and/or apparent agents, servants, and/or employees', without any negligence or want of due care on the part of the plaintiff contributing thereto.

### C.  COUNT THREE – Negligent Supervision and Training

101.  The Plaintiff M.M. incorporates each foregoing allegations.

102.  The Defendant had a duty to use reasonable care to select, train, supervise, and retain its employees working at its hotels, including but not limited to, proper training and or supervision relating

to the observation, investigation, and reporting of signs of human trafficking and sexual exploitation in or about hotels.

103.   At the time of the incidents alleged herein, the Defendant employed staff to operate their hotels and properties, including, but not limited to, front desk clerks, night auditors, housekeeping staff, and/or maintenance workers. Throughout this time period, as outlined above, the Defendant and/or their actual and/or apparent agents, servants, and/or employees', repeatedly failed to observe and report signs of human trafficking and or sexual exploitation taking place at the Defendant's hotels. Furthermore, upon information and belief, the Defendant, and/or their actual and/or apparent agents, servants, and/or employees', repeatedly failed to address this peculiar risk at all.

104.   Additionally, prior to the incidents alleged herein, the Defendant failed to properly train their employees regarding security and the detection of criminal activity in their hotels and on their properties, including, but not limited to, signs of human trafficking and sexual exploitation.

105.   The Defendant breached this duty of care by acts, omissions, and commissions including, but not limited to:

j.   Failure to adequately train, supervise, and retain employees to ensure proper monitoring of surveillance cameras at their hotels and properties for signs of human trafficking and/or sexual exploitation.

k.   Failure to adequately train, supervise, and retain employees to ensure proper monitoring of the number of guests in each room of their hotels, and non-guest visitors in their hotels.

l.   Failure to provide and/or train adequate security in their hotels with the knowledge that said premises had a history of criminal activity;

m.   Failure to adequately train, supervise, and retain employees, to ensure proper monitoring of their hotels for signs of dangerous conditions including, but not limited to, human trafficking, sexual exploitation, rape, and kidnapping, by ignoring the following

24

conditions:

    i.   The repeated refusal of maid service;

    ii.   The repeated, almost exclusive, use of side or rear exits for ingress and egress.

    iii.   The number and frequency of visitors entering and exiting the hotel and/or property;

    iv.   Guests present in any particular room in excess of the rooms capacity;

    v.   Signs of the repeated verbal abuse, physical abuse, restraint and/or confinement of an individual by another;

    vi.   Signs of control over an individual and/or an individual's personal property by another, including, but not limited to, identification documents;

    vii.   Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire; and

    viii.   The repeated renting of specific rooms in the hotel and/or presence on the property.

n.  Failure to adequately train, supervise, and retain employees, to ensure proper monitoring of their hotels for signs of suspicious behavior on the premises, which would have alerted the Defendant to the sex trafficking of M.M., or other criminal activity to which she was a victim, including, but not limited to sounds of distress coming from rooms and areas in the hotel and/or on the property, non-guests entering and exiting rooms in the hotel and/or on the property, the repeated renting of specific rooms in the hotel and/or presence on the property, and the apparent purchasing of sex acts in the hotel and/or on the property;

o.  Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure the investigation of suspicious behavior at their hotel and/or properties which would have

alerted the Defendant to the sex trafficking of M.M. and/or other criminal activity to which she was a victim;

p. Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure proper reporting to law enforcement of signs of criminal activity at their hotels and/or on their properties, including, but not limited to human trafficking and sexual exploitation;

q. Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants, contractors and/or employees, including, but not limited to, training to ensure a timely response and investigation into guest complaints regarding suspicious behavior at their hotels and/or on their properties, which would have resulted in their discovery of the sex trafficking of M.M. and/or other criminal activity to which she was a victim; and

r. Being otherwise careless and negligent.

106.    As a direct and proximate result of the aforementioned negligent acts, omissions, and/or commissions by the Defendant, M.M. was kidnapped, repeatedly and consistently assaulted both physically and sexually, verbally abused, held against her will, regularly exploited, and was otherwise irreparably injured, both physically and psychologically. Said acts were repeatedly perpetrated at the Defendant's hotels and properties and the Defendant failed to prevent against such criminal activity. The imminent harm described above, as well as M.M.'s injuries, were a foreseeable and preventable result of the Defendant's negligence and their failure to adequately train and supervise their servants, contractors, employees and/or agents.

107.    M.M. has suffered, and/or will continue to suffer, from injuries, including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss, past, present and future, as a direct and proximate result of the Defendant's failure to adequately train, supervise, and retain their employees to adequately recognize and investigate indicia of criminal activity. The Defendant's failure to adequately train, supervise, and retain their employees,

26

agents, and/or contractors facilitated such an environment of disorder and violence that the injuries sustained by M.M. were both foreseeable and imminent.

108.    Additionally, M.M. has suffered, and continues to suffer, from damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and/or medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendant's, and/or their actual and/or apparent agents, servants, contractors and/or employees', negligent acts, omissions, and/or commissions.

109. Furthermore, M.M. has suffered, and continues to suffer, from injuries, including, but not limited to, a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life expectations.

110. The Plaintiff avers that all damages, past, present, and future, were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendant and/or their actual and/or apparent agents, servants, contractors and/or employees', without any negligence or want of due care on the part of the Plaintiff contributing thereto.

### D.  COUNT FOUR – Unjust Enrichment

111.    The Plaintiff M.M. incorporates each foregoing allegations.

112.    As a result of the trafficking and sexual exploitation of M.M., the Defendant unjustly financially benefitted, and enriched themselves at M.M.'s expense by their acts, omissions, and commissions including, but not limited to:

    a.  Profit from renting rooms to those looking to sexually exploit M.M.

    b.  Increased profit margins due to lower operation costs by refusing to implement proper training of Defendant's employees and managers regarding the identification of human trafficking and sexual exploitation;

    c.  Increased profit margins due to lower operation costs by refusing to install proper security devices in the lobby, hallways, and parking lots of the Defendant's hotels and

properties that would help (a) deter human trafficking and sexual exploitation and (b) be used to identify the occurrence of human trafficking and sexual exploitation and alert the proper authorities and/or intervene in an appropriate way;

d.  Increased profit margins due to lower operation costs by refusing to install adequate lighting and security cameras to monitor ingress and egress of human traffickers and visitors looking to purchase sex at the Defendant's hotels and properties.

e.  Increased profit margins due to lower operation costs by refusing to hire qualified security officers who would actively combat human trafficking and sexual exploitation.

f.  Increased profit margins due to lower operation costs by refusing to implement proper security measures to prevent and identify human trafficking and sexual exploitation at the Defendant's hotels and property.

g.  Increased profit margins as a result of the continued customer loyalty of traffickers and buyers of commercial sex who sought to exploit individuals, like M.M., due to the Defendant's lack of measures against sexual exploitation and human trafficking. This customer loyalty lead to continued alcohol, food, and room sales.

h.  Benefit of avoiding interference by law enforcement officials and spending the time to address and properly solve any incidence or pattern of human trafficking or sexual exploitation at the Defendant's hotel or property. This prevented the Defendant from having to spend the time and money to fill out all proper and necessary law enforcement reports and information, respond to proper and necessary subpoena requests, and cooperate with any inquiry and needs of the prosecution.

i.  Increased profit margins by knowingly catering to the needs of a criminal subculture that is looking for locations that will not actively enforce laws against human trafficking and sexual exploitation or take active security measures to prevent human trafficking or sexual exploitation on their property.

28

113.     These benefits were conferred onto the Defendant with their knowledge of the trafficking and/or sexual exploitation of M.M. and others like her. The Defendant accepted and retained these benefits under circumstances that make it inequitable for them to retain them without paying their value.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE based on the forgoing the Plaintiff seeks injunctive relief in the form of a judgement requiring the Defendant to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated to the Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

    a. All available compensatory damages for the described losses with respect to each cause of action;

    b. past and future medical expenses, as well as the costs associated with past and future life care;

    c. past and future lost wages and loss of earning capacity;

    d. past and future emotional distress;

e.  consequential and/or special damages;

f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.  punitive damages with respect to each cause of action;

h.  reasonable and recoverable attorneys' fees;

i.  costs of this action; and

j.  pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: January 15, 2020

**RESPECTFULLY SUBMITTED,**
**PLAINTIFF,**
**By Her Attorneys,**

/s/ C.J. Kishish
C.J. Kishish (Minnesota Bar #229805)
Kishish Law Group, LLC
1555 Southcross Drive West
Burnsville, Minnesota 55306
T: (888) 402-5552
E: ckishish@kishishlaw.com

/s/ Kimberly L. Adams
Kimberly  L. Adams (*pro hac vice*
admission forthcoming)
FL Bar No. 0014479
Kathryn L. Avila (*pro hac vice*
admission forthcoming)
FL Bar No. 1019574
316 S. Baylen St. Suite 600
Pensacola, FL 32502
T: (850) 435-7000

30

E: kadams@levinlaw.com /
kavila@levinlaw.com

/s/ Teresa A. Curtin, Esq.
Teresa Curtin (*pro hac vice*
admission forthcoming)
Maine Bar No. 9391
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY 10003
Phone: (212) 558-5907
Fax: (646) 293-4360
TCurtin@weitzlux.com

# EXHIBIT A



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This toolkit offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes posters of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign



# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- **Sex Trafficking**
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. **No exceptions.**

- **Forced Labor**
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- **Domestic Servitude**
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

## Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.





For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

## GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.
- Individuals show signs of physical abuse, restraint, and/or confinement.
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.
- Individuals lack freedom of movement or are constantly monitored.
- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.
- Individuals have few or no personal items—such as no luggage or other bags.
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.
- A group of girls appears to be traveling with an older female or male.
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign



## SIGNS OF HUMAN TRAFFICKING
For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

### GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





**For Concierge, Bellman, Front Desk, Security, and Valet Staff**

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

## GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





# SIGNS OF HUMAN TRAFFICKING
## For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

### GENERAL INDICATORS

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign